FILED
JAMES BONINI

IN THE UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF OHIO '04 5 PM 1:26
WESTERN DIVISION

SOUTHERN DIST OHIO
WESTERN DIV DAYTON

UNITED STATES OF AMERICA

             v. :

**(1) EARL MARSHALL,** :
(Counts 1, 2, 3, 4, 5, 6 and :    CASE NO.: CR-3-04-140
Forfeiture) :

**(2) TICO HILL,** :
(Counts 1, 2, 3) :    **S U P E R S E D I N G**
:
**(3) JEFF PARKER,** :    **I N D I C T M E N T**
(Counts 1, 2 and Forfeiture) :

**(4) TODD ANTHONY BROWN,** :
(Count 1) :    18 U.S.C. § 2
:    18 U.S.C. § 371
**(5) KENYATTA MORELAND,** :    18 U.S.C. § 1623
(Count 1) :    18 U.S.C. § 1956(a)(1)(B)(i)
:    18 U.S.C. § 1956(h)
**(6) HENRY RAYFORD,** :    21 U.S.C. § 846
(Count 1) :    21 U.S.C. § 848(a)&(b)
:    21 U.S.C. § 853
**(7) CLARENCE PARKER,** :
(Count 1, 2 and Forfeiture) :

**(8) CECILE MARSHALL,** :
(Counts 2, 4) :
:
**(9) TRACY MARSHALL,** :
(Counts 1, 2, 6 and :
Forfeiture) :
:
**(10) LYNETTE DAVIS,** :
(Count 2, 6) :
:
**(11) GLEN HURST,** :
(Counts 2, 3, 6) :
:
**(12) DEBRA HURST,** and :
(Counts 2, 3, 6) :
:
**(13) KIM MCGINNIS,** :
(Counts 2, 3, 6) :
:

**(14) CHARLES GOFF, JR,**      :
    (Counts 1, 2)         :
     :
**(15) BRYANT BRIGGS,**       :
    (Counts 1, 2)         :
     :
**(16) JANELL STEPHENS,**      :
    (Counts 2, 6)         :
     :
**(17) THERESA JONES,**       :
    (Counts 2, 6, 7)       :
     :

THE GRAND JURY CHARGES THAT:

<u>**COUNT 1**</u>
**(Conspiracy to Distribute and Possess with Intent to**
**Distribute in Excess of One Hundred Fifty Kilograms of Cocaine)**

Beginning on or about September 27, 1996, the exact date being unknown, and continuing thereafter up to and including October 12, 2004, in the Southern District of Ohio and elsewhere, defendants, **EARL MARSHALL, TICO HILL, JEFF PARKER, TODD ANTHONY BROWN, KENYATTA MORELAND, HENRY RAYFORD, CLARENCE PARKER, TRACY MARSHALL** and **BRYANT BRIGGS** did knowingly, willfully, intentionally, and unlawfully combine, conspire, confederate and agree, with each other and with others whose identities are both known and unknown to the Grand Jury, to commit offenses against the United States, to wit: to knowingly, intentionally and unlawfully distribute and possess with intent to distribute in excess of one hundred fifty kilograms of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

-2-

**Objects of the Conspiracy**

1.  It was an object of the conspiracy to purchase controlled substances from outside and within the Southern District of Ohio and, when purchased from outside the Southern District of Ohio, to transport the controlled substances to the Dayton, Ohio area.

2.  It was also an object of the conspiracy to store, repackage and resell these controlled substances for profit in the Southern District of Ohio.

3.  It was also an object of the conspiracy to avoid detection by the use of couriers, cash transactions and fabricated stories to explain actions of conspiracy members to law enforcement investigators.

4.  It was also an object of the conspiracy to launder the proceeds of the conspiracy in order to avoid detection and payment of taxes while allowing members of the conspiracy to enjoy the material benefits of money generated by the conspiracy.

**Manner and Means**

1.  It was a part of the conspiracy that members of the conspiracy would arrange for cocaine to be delivered to the Southern District of Ohio.

2.  It was further part of the conspiracy that defendants, **EARL MARSHALL, TICO HILL, JEFF PARKER, TODD ANTHONY BROWN, HENRY RAYFORD, KENYATTA MORELAND, TRACY MARSHALL, CHARLES GOFF, JR., BRYANT BRIGGS** and others known and unknown to the Grand Jury,

-3-

distributed cocaine in the Southern District of Ohio for profit.

3. It was further part of the conspiracy that defendant **CLARENCE PARKER** and other members of the conspiracy transported, in the Southern District of Ohio and elsewhere, drugs and proceeds from the sale of drugs from one location to another.

4. It was further part of the conspiracy that defendant **EARL MARSHALL, TICO HILL, JEFF PARKER, TRACY MARSHALL** and other members of the conspiracy would own or lease real property, sometimes in the names of third parties, which were used as "stash houses" or locations where money or drugs would be stored, packaged, repackaged, weighed, cooked and otherwise prepared for transportation and distribution.

5. It was further part of the conspiracy that defendants **EARL MARSHALL, TICO HILL, JEFF PARKER, TRACY MARSHALL, CHARLES GOFF, JR.**, and other members of the conspiracy, conducted financial transactions to conceal and disguise the nature, location, source, ownership and control of drug proceeds.

6. It was further part of the conspiracy that defendants **EARL MARSHALL, TICO HILL** and **JEFF PARKER** would use fear and intimidation, including the possession and use of firearms, to further the goals of the conspiracy.

7. It was further part of the conspiracy that defendants **EARL MARSHALL** and **BRYANT BRIGGS** would obtain, in their own names or the name of others, vehicles with secret compartments in which

-4-

cocaine or cash proceeds from the sale of cocaine could be covertly transported.

8. It was further part of the conspiracy that between approximately 1996 and 2000, defendants **EARL MARSHALL, TICO HILL, JEFF PARKER, TODD ANTHONY BROWN, HENRY RAYFORD** and **KENYATTA MORELAND** delivered more than 30 kilograms of cocaine to Cooperating Co-Conspirator One (CC-1), whose identity is known to the Grand Jury.

9. It was further part of the conspiracy that between approximately 1997 and 1999, defendant **EARL MARSHALL** delivered multiple kilograms of cocaine to Cooperating Co-Conspirator Two (CC-2), whose identity is known to the Grand Jury.

10. It was further part of the conspiracy that between late 1997 and early 2002, defendants **EARL MARSHALL, TICO HILL, JEFF PARKER** and **TODD ANTHONY BROWN** delivered more than 200 kilograms of cocaine to Cooperating Co-Conspirator Three (CC-3), whose identity is known to the Grand Jury.

11. It was further part of the conspiracy that during the existence of the conspiracy, defendant **EARL MARSHALL**, delivered multiple kilograms of cocaine to a co-conspirator who then delivered the cocaine to Cooperating Co-Conspirator Four (CC-4), whose identity is known to the Grand Jury.

12. It was further part of the conspiracy that between about late 1998 and the year 2000, defendants **EARL MARSHALL, TICO HILL,** and

-5-

**BRYANT BRIGGS** delivered more than 75 kilograms of cocaine to Cooperating Co-Conspirator Five (CC-5), whose identity is known to the Grand Jury.

13. It was further part of the conspiracy that between approximately about 1999 and 2004, defendants **EARL MARSHALL**, **JEFF PARKER** and **HENRY RAYFORD** delivered more than one hundred fifty kilograms of cocaine to Cooperating Co-Conspirator Six (CC-6), whose identity is known to the Grand Jury.

14. It was further part of the conspiracy that throughout the existence of the charged conspiracy, defendants **EARL MARSHALL**, **TICO HILL** and **JEFF PARKER** delivered multiple kilograms of cocaine to Cooperating Co-Conspirators Seven and Eight (CC-7, CC-8), whose identities are known to the Grand Jury.

15. It was further part of the conspiracy that between the Summer of 2003 and early 2004, defendants **EARL MARSHALL** and **JEFF PARKER** received multiple kilograms of cocaine from Cooperating Co-Conspirator Nine (CC-9), whose identity is known to the Grand Jury.

### Overt Acts

In furtherance of the conspiracy, and to achieve the objects thereof, the defendants and their co-conspirators committed, among others, the following overt acts in the Southern District of Ohio and elsewhere:

1. On or about March 5, 1998, Cooperating Co-conspirator Ten (CC-10) possessed approximately 26 ounces of cocaine. The

-6-

cocaine seized was part of three kilograms CC-10 had obtained from defendant **EARL MARSHALL.**

2. Between about July of 1998 and March of 1999, defendant **CHARLES GOFF, JR.** delivered more than ten kilograms of cocaine to defendant **EARL MARSHALL.**

3. On a date unknown, but between September 27, 1996 and December 29, 1998, defendant **EARL MARSHALL** obtained a 1992 white Ford Taurus, bearing Ohio dealer plate 4D3DG and VIN 1FACP52U3NA196920, which was equipped with an electronically controlled secret compartment behind the rear seat. The car was registered to defendant **JANELL STEPHENS**, who is not charged in this count of the Superseding Indictment.

4. On or about January 27, 1999, defendant **EARL MARSHALL** caused the white Ford Taurus registered to defendant **JANELL STEPHENS** to be in a garage in the Chicago, Illinois area for purposes of drug distribution.

5. On or about March 8, 2002, defendant **CLARENCE PARKER** possessed $69,935 which were drug proceeds earned by defendant **JEFF PARKER** during the course of the conspiracy.

6. On a date unknown, but between September 27, 1996 and May 6, 2004, defendant **EARL MARSHALL** delivered a purple Chrysler Concorde to defendant **BRYANT BRIGGS** for use in drug trafficking.

7. On or about May 6, 2004, defendant **BRYANT BRIGGS**

possessed a 1999 purple Chrysler Concorde with an electronically controlled secret compartment behind the rear seat for use in drug trafficking. Although the 1999 Chrysler was registered to defendant **BRYANT BRIGGS,** the license plate on the vehicle had been issued to a 1998 Chrysler Concorde registered to defendant **LYNETTE DAVIS,** who is not charged in this count of the Superseding Indictment.

8. In addition to the above overt acts, the alleged overt acts contained in Counts 2 and 6, as well as the substantive acts alleged in Counts 3 and 4 of this Superseding Indictment are hereby specifically incorporated herein by reference and re-alleged word for word as overt acts committed in furtherance of this count.

All in violation of Title 21, United States Code, Section 846.

### Forfeiture Allegation

Upon conviction of the controlled substance offense alleged in Count 1 of this Indictment, defendants **EARL MARSHALL, JEFF PARKER, CLARENCE PARKER**, and **TRACY MARSHALL**, shall forfeit to the United States pursuant to 21 U.S.C. § 853, any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the said violation and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violation, including but not limited to approximately

-8-

$69,935.00 in United States currency seized from CLARENCE PARKER on or about March 8, 2002.

## COUNT 2
### (Conspiracy to Launder Money)

Beginning on a date unknown, but no later than August 15, 1997, and continuing up to and including March 10, 2004, in the Southern District of Ohio and elsewhere, defendants **EARL MARSHALL, TICO HILL, JEFF PARKER, TRACY MARSHALL, CLARENCE PARKER, CECILE MARSHALL, LYNETTE DAVIS, GLEN HURST, DEBRA HURST, KIM MCGINNIS, CHARLES GOFF, JR., BRYANT BRIGGS, JANELL STEPHENS** and **THERESA JONES** did knowingly, willfully and intentionally combine, conspire, confederate and agree with each other and with others whose identities are both known and unknown to the Grand Jury, to commit the following offense against the United States, to wit: to unlawfully, knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate commerce, which involved the proceeds of specified unlawful activity, that is the unlawful distribution of controlled substances and conspiracy to do the same in violation of Title 21, United States Code, Sections 841 and 846 and wire fraud in violation of 18 united States Code Section 1343, knowing that the transactions were designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activities and that while

-9-

conducting and attempting to conduct such financial transactions, the defendants knew that the property involved in the financial transactions, represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Objects of the Conspiracy

1. It was an object of the conspiracy that financial transactions were completed in order to conceal and disguise the fact that the funds and/or proceeds used in the transactions were derived from drug dealing.

2. It was an object of the conspiracy to attempt to conceal the substantial financial investment of co-conspirators with little or no legitimate income.

3. It was an object of the conspiracy to obtain apparently legitimate funds in the form of loans by providing fraudulent information when attempting to obtain those loans.

4. It was an object of the conspiracy to allow co-conspirators to enjoy the benefits of the substantial proceeds received through their drug dealing while attempting to insulate them from criminal prosecution.

### Manner and Means

1. It was part of the conspiracy that defendants **EARL MARSHALL, TICO HILL, JEFF PARKER,** and **CHARLES GOFF, JR.,** would use proceeds of illegal drug dealing to obtain items of real and

-10-

personal property which would be placed in the names of friends, relatives and associates in an attempt to disassociate defendants **EARL MARSHALL, TICO HILL, JEFF PARKER** and **CHARLES GOFF, JR.,** from any interest in the property.

2. It was also part of the conspiracy that the defendants **EARL MARSHALL, TICO HILL, JEFF PARKER**, and **CHARLES GOFF, JR.,** obtained items of real and personal property through financial transactions in an attempt to conceal and disguise the nature, location, source, ownership, and control of the funds used to purchase the property.

3. It was also part of the conspiracy that the defendants **GLEN HURST, DEBRA HURST,** and **KIM MCGINNIS** created, supervised or directed the creation of fraudulent documents to assist in the processing and approval of the mortgage loan applications of other co-conspirators.

4. It was also part of the conspiracy that the defendants **CLARENCE PARKER, CECILE MARSHALL, TRACY MARSHALL, LYNETTE DAVIS,** and **JANELL STEPHENS** placed items of real and personal property in their names as straw purchasers, that is, purported purchasers, with the intent to conceal the true purchasers' identity, thereby assuming a role on paper only and not in fact, and they contributed either little or no financial support to the purchases.

5. It was also part of the conspiracy that the defendants

-11-

**CLARENCE PARKER, CECILE MARSHALL, TRACY MARSHALL, LYNETTE DAVIS, JANELL STEPHENS,** and **THERESA JONES** conducted financial transactions on behalf of defendants **EARL MARSHALL** and **BRYANT BRIGGS** said transactions being designed to conceal or disguise the true nature, ownership and source of the funds involved in the transactions.

**OVERT ACTS**

In furtherance of the conspiracy, and to achieve the objects thereof, the defendants and their co-conspirators committed, among others, the following overt acts in the Southern District of Ohio:

**1. Purchase of 844 Groveland**

a. On a date unknown, but prior to February 27, 1997, defendant **EARL MARSHALL** contacted the owners of a seafood business indicating that defendant **CECILE MARSHALL**, defendant **EARL MARSHALL's** grandmother, was interested in purchasing the business.

b. On or about February 27, 1997, defendant **EARL MARSHALL,** through defendant **CECILE MARSHALL,** who was acting as a straw purchaser, purchased the seafood business which was located at 844 Groveland Avenue in Dayton, Ohio and changed the name to Cecil's Seafood.

c. On or about February 27, 1997, the owners of the seafood business entered into a land contact with defendant

-12-

**CECILE MARSHALL** for her to purchase the business for $30,000 and the land and building for $85,000. The contract called for a down payment, monthly payments of $950 on the loan and $200 for an unpaid portion of the down payment.

      d. Many of the monthly payments made on the contract were paid by defendant **EARL MARSHALL** and many were paid in cash.

      e. On or about November 1, 1997, defendant **EARL MARSHALL** made a payment of $10,000 cash to the previous owner, for which he (**MARSHALL**) received receipt number 70623.

      f. On or about March 2, 1998, defendant **EARL MARSHALL** made a payment of $10,000 cash to the previous owner, for which he (**MARSHALL**) received receipt number 70626.

    **2. Purchase of 272 Valley View Drive**

      a. On or about December 11, 1998, defendant **EARL MARSHALL**, obtained a loan using American Funding Group, Inc., later known as American Funding Agency, Inc., and hereinafter referred to in this Superseding Indictment as American Funding Group, Inc., a mortgage brokerage company operated by defendants **GLEN HURST** and **DEBRA HURST** and which employed defendant **KIM MCGINNIS**. The loan obtained by **MARSHALL** was used to purchase the property at 272 Valley View Drive in Dayton, Ohio for $76,300.

      b. On or about December 11, 1998, defendant **EARL MARSHALL** completed and signed a Uniform Residential Loan

-13-

Application listing **MARSHALL's** employment as general manager of Cecil's Seafood.  The information on the application stated that **MARSHALL** had been employed by Cecil's Seafood for five years, at least three years longer than that business had been operating

 c. Contained in the closing documents were forged federal W-2 documents for 1996 and 1997, purportedly issued by Cecil's Seafood reporting wages paid by the business to defendant **EARL MARSHALL** in the amounts of $61,062.60 and $62,951.14, respectively.  These documents were created by or at the direction and under the supervision of defendants **GLEN HURST**, **DEBRA HURST** and **KIM MCGINNIS**.

 d. Also contained in the closing documents was a fraudulent pay stub for the pay period ending November 27, 1998, purportedly issued by Cecil's Seafood, reporting year-to-date wages paid by the business to defendant **EARL MARSHALL** in the amount of $58,657.88.  This document was created by or at the direction and under the supervision of defendants **GLEN HURST**, **DEBRA HURST** and **KIM MCGINNIS**.

 e. Defendant **EARL MARSHALL** did not work at Cecil's Seafood and no such income was reported to the Internal Revenue Service.

 f. On or about October 4, 2004, defendant **EARL MARSHALL** reportedly sold the property for $20,000.

### 3.  Purchase of 1999 Plymouth Prowler

a.  On or about December 1, 1998, defendant **CHARLES GOFF, JR.**, through West End Auto Sales, a Dayton area used car dealership, purchased a 1999 Plymouth Prowler at a southern Ohio auto auction for just over $45,000.

b.  On or about December 1, 1998, defendant **CHARLES GOFF, JR.**, gave West End Auto Sales $45,000 in U.S. currency, obtained by means of drug trafficking, to pay for the Prowler.

c.  On or about December 1, 1998, $9,500 was deposited into West End Auto Sales's checking account

d.  On or about December 2, 1998, $25,000 cash was deposited into West End Auto Sales's checking account.

e.  On or about December 3, 1998, $9,000 cash was deposited into West End Auto Sales's checking account.

f.  On or about February 25, 1999, title to the Prowler was transferred from the auction to West End Auto Sales, where it remained until the vehicle was sold.

g.  In or about late March or early April 1999, defendant **EARL MARSHALL** contacted the West End Auto Sales and advised them that **GOFF** wanted the car sold.

h.  On or about April 22, 1999, the Prowler was taken to a second southern Ohio auto auction where it was sold for $42,000.  The proceeds of the sale, $41,588, were deposited in West End Auto Sales's checking account.

i.  On or about April 27, 1999, those proceeds were withdrawn and used to purchase Midwest Credit Union Official check number 490059527 in the amount of $41,000 payable to Chelsea Title Agency, Inc.  That official check was provided to defendant **EARL MARSHALL** and was later negotiated by defendant **TICO HILL** during the purchase of the residence at 2285 Diamond Mill Road.

### 4.  Purchase of 4424 Genesee

a.  On or about March 23, 1999, defendant **EARL MARSHALL** d/b/a Dayton Real Estate Investments, a business setup by **MARSHALL** to assist in laundering his drug profits, purchased the property at 4424 Genesee, Dayton, Ohio for $13,000.

b.  On or about March 31, 1999, defendant **JANELL STEPHENS,** a/k/a **JANELL MARSHALL**, a girlfriend of defendant **EARL MARSHALL** and purported employee of Dayton Real Estate Investments, purchased the property at 4424 Genesee from Dayton Real Estate Investments for $59,000.

c.  On or about March 31, 1999, defendant **JANELL STEPHENS** obtained a $41,300 loan through Option One Mortgage using the services of American Funding Group, Inc.

d.  Documents in the closing package included a Uniform Residential Loan Application signed by defendant **JANELL MARSHALL** on March 31, 1999 falsely stating that she had worked at Cecil's Seafood for more than two years as a bookkeeper earning nearly

-16-

$1700.00 each month as well as a fraudulent Employment Verification form. These documents were created by or at the direction and under the supervision of defendants **GLEN HURST**, **DEBRA HURST** and **KIM MCGINNIS.**

     e. On or about November 1, 2001 the property was sold at a foreclosure sale for $14,000. During the course of the loan obtained by defendant **JANELL MARSHALL**, only a few payments were made prior to the loan being defaulted.

    **5. Purchase of 2285 Diamond Mill Road**

     a. On or about April 28, 1999, defendant **TICO HILL**, using American Funding Group, Inc., purchased the property at 2285 Diamond Mill Road, Brookville, Ohio, for $165,000.

     b. On or about April 28, 1999, the sale of the residence at 2285 Diamond Mill Road closed at which time defendant **TICO HILL** provided a down payment of $61,576.93. Funds for the down payment came from:

     (1) Midwest Credit Union Official check number 490059527 in the amount of $41,000 payable to Chelsea Title Agency, Inc., and,

     (2) Bank One Official Check number 626449608, with defendant **TICO HILL** listed as the remitter, in the amount of $19,500 payable to Chelsea Title Agency, Inc.

     c. On or about April 28, 1999, defendant **TICO HILL** signed a Uniform Residential Loan Application which falsely

-17-

stated that **HILL** had been employed as the General Manager of Cecil's Seafood for two and a half years earning a monthly income of $3,820.83.

d.   Among the fraudulently prepared documents included in the closing paperwork were a Request for Verification of Rent or Mortgage Account with the forged signature of a Dayton area real estate agent and a fraudulent Request for Verification of Deposit.   These documents were created by or at the direction and under the supervision of defendants **GLEN HURST, DEBRA HURST** and **KIM MCGINNIS.**

**6.   Purchase of 106 Deans Court**

a.   On or about July 19, 2001, defendant **EARL MARSHALL** purchased the property at 106 Deans Court, Union, Ohio using his girlfriend, defendant **LYNETTE DAVIS,** as a straw purchaser.   The property sold for $221,000 with a down payment of $56,963.52. The mortgage loan application was processed through American Funding Group, Inc.

b.   On or about July 19, 2001, defendant **LYNETTE DAVIS** signed a Uniform Residential Loan Application listing her employer as B & J Investments.

c.   Included in the closing documents were a fraudulent pay stub for defendant **LYNETTE DAVIS** from B & J Investments as well as fraudulent W-2 forms for defendant **LYNETTE DAVIS** from B & J Investments.   These documents were created by or at the

-18-

direction and under the supervision of defendants **GLEN HURST**, **DEBRA HURST** and **KIM MCGINNIS.**

### 7. Purchase of 6600 Westford Avenue

a. On or about September 21, 2001, defendant **EARL MARSHALL** purchased the property at 6600 Westford Avenue, Dayton, Ohio, using his aunt, defendant **TRACY MARSHALL,** as a straw purchaser. The property sold for $125,000 with a down payment of $18,459.76. The mortgage loan application was processed through American Funding Group, Inc.

b. The entire down payment was made with National City Bank Official Check number 202819314, listing the remitter as defendant **TRACY MARSHALL** c/o defendant **EARL MARSHALL.**

c. On or about September 21, 2001, defendant **TRACY MARSHALL** signed a Uniform Residential Loan Application listing her employer as B & J Investments.

d. Included in the closing documents were fraudulent pay stubs for defendant **TRACY MARSHALL** from B & J Investments as well as fraudulent W-2 forms for defendant **TRACY MARSHALL** from B & J Investments. These documents were created by or at the direction and under the supervision of defendants **GLEN HURST, DEBRA HURST** and **KIM MCGINNIS.**

### 8. Sale of 2285 Diamond Mill Road

a. On or about December 13, 2001, the property at 2285

-19-

Diamond Mill Road, Brookville, Ohio, was sold by defendant **TICO HILL** to defendant **CLARENCE PARKER** for $175,000 with a down payment of $18,432.50. Defendant **CLARENCE PARKER** applied for a mortgage loan through American Funding Group, Inc.

b. Defendant **CLARENCE PARKER** was recruited by his uncle, defendant **JEFF PARKER,** to purchase both this property and other property at 685-687 Randolph, Damon, Ohio.

c. Defendants **JEFF PARKER** and **KIM MCGINNIS** advised defendant **CLARENCE PARKER** that he would not have to make the down payment or any other payments on the property.

d. Defendant **CLARENCE PARKER** did not provide the funds for the down payment or any other payments on this property.

e. Subsequent to the property at 2285 Diamond Mill Road being placed in the name of defendant **CLARENCE PARKER,** a local real estate agent was contacted by defendant **TICO HILL** to sell the property. **HILL** indicated the property was his. The agent later sold the property which was in the name of defendant **CLARENCE PARKER.**

**9. Lease Purchase of 45' Motor Coach**

a. On or about January 23, 2003, a motor coach dealer in Webster, Florida (Dealer) entered into a Lease Purchase Agreement with defendant **EARL MARSHALL,** d/b/a Iced Out Records of Dayton, Ohio, for a 2000 Prevost 45 foot Entertainer Motor Coach, Model

XL, serial number 2PCE33494Y1026995.  The agreement called for a $50,000 down payment and monthly payments of $5,250.47.  In addition, the first two monthly payments were to be accompanied with a $25,000 additional payment for a total monthly payment of $30,250.47 for the first two months of the lease.  The deal was brokered by another Florida company (Broker).

b.  On or about January 23, 2003, Dealer received three official checks to satisfy the $50,000 down payment required by the lease purchase agreement.

c.  One of the official checks delivered to Dealer as part of the down payment was National City Bank Official Check 569407247, dated January 21, 2003, issued in the amount of $30,000.  This official check was obtained by the mother and stepfather of Cooperating Co-conspirator Eleven (CC-11). Prior to January 21, 2003, CC-11's mother and stepfather had received a second mortgage on their house from a title agency. The funds were received by means of title agency check number 45654, issued January 21, 2003, in the amount of $31,987.67.  The mother and stepfather obtained the National City Bank Official Check after CC-11 told them that he (CC-11) had an associate, defendant **EARL MARSHALL,** who needed a $30,000 cashier's check to help fund a youth basketball team.

(1) On or about January 21, 2003, CC-11 introduced his mother and stepfather to defendant **EARL MARSHALL.**  The mother

-21-

and stepfather were again told that **MARSHALL** needed the cashier's check to fund a youth basketball team.  **MARSHALL** gave the parents $30,000 cash in return for the $30,000 official check.

      d.  On or about January 23, 2003, defendant **EARL MARSHALL** provided CC-11 with a bag containing an additional $20,000 in U.S. currency and instructed CC-11 to obtain a cashier's payable to Dealer.

      e.  The other two official checks received by Dealer for the down payment were obtained by CC-11 using the $20,000 cash received from defendant **EARL MARSHALL**.  One of those checks was Bank One Official Check number 063821870 and the other was Fifth Third Bank Official Check number 0924306.  Both checks were dated January 23, 2003, and both were in the amount of $10,000.

      f.  Bank One Official Check number 063821870 was obtained with funds derived from the following sources:

      (1)  Travelers Express Moneygram money order number 87652735049, in the amount of $500 obtained by the spouse of CC-11,

      (2)  Travelers Express Moneygram money order number 87652735038, in the amount of $1,000 obtained by the spouse of CC-11,

      (3)  Bank One Official Check number 063835880, dated January 23, 2003, in the amount of $3,500, obtained by and payable to the spouse of CC-11,

(4) Bank One Official Check number 063835881, dated January 23, 2003, in the amount of $3,000, obtained by and payable to the spouse of CC-11,

(5) Travelers Express Moneygram money order number 87652735050, in the amount of $500 obtained by the spouse of CC-11 and,

(6) $1,500 in U.S. currency.

g.   Fifth Third Bank Official Check number 0924306 was obtained by CC-11 with $10,000 cash.

h.   CC-11 received $9,000 cash as payment for obtaining the above mentioned financial instruments for the down payment on the motor coach.

i.   On or about March 5, 2003, Dealer received the first monthly payment on the motor coach in the form of check number 3928841979 dated March 5, 2003, drawn on Broker's business account in the amount of $30,252.   During the first two weeks of March 2003, Broker's account received the following wire transfers from financial institutions in the Dayton area:

(1) On or about March 5, 2003, $3,000 from the Wright Paterson Credit Union account of defendant **THERESA JONES**,

(2) On or about March 5, 2003, $3,000 from the Wright Patterson Credit Union account of a female relative of defendant **THERESA JONES**,

(3) On or about March 6, 2003, $5,000 from the Wright

-23-

Patterson Credit Union account of a female relative of an employee of Iced Out Records associated with defendant **EARL MARSHALL**,

(4) On or about March 6, 2003, $10,000 from the Wright Patterson Credit Union account of a female relative of defendant **BRYANT BRIGGS,**

(5) On or about March 7, 2003, $5,000 from the Fifth Third Bank account of a female associated with defendant **EARL MARSHALL** and Iced Out Records,

(6) On or about March 13, 2003, $3,000, from the Wright Patterson Credit Union account of the individual described in paragraph (3) above,

j. On or about April 3, 2003, defendant **THERESA JONES** deposited $5,900 in U.S. currency into her U.S. Bank checking account.

k. On or about April 3, 2003, defendant **THERESA JONES** issued check number 512 on her U.S. Bank checking account in the amount of $5,250 payable to Dealer.

l. The funds described above were provided by defendant **EARL MARSHALL** and were not the personal funds of the account holders who conducted the transactions.

10. In addition to the above overt acts, the acts alleged in Counts 3 and 4 as well as Overt Act 1, 2, 3, 5, 6 and 9 alleged in Count 6 of this Superseding Indictment are hereby specifically

-24-

incorporated herein by reference and re-alleged word for word as overt acts committed in furtherance of this count.

All in violation of Title 18, United States Code, Section 1956(h).

### COUNT 3
### (Money Laundering)

On or about March 21, 2001, in the Southern District of Ohio, defendants **EARL MARSHALL, TICO HILL, GLEN HURST, DEBRA HURST** and **KIM MCGINNIS** did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate commerce, to wit, the purchase of the property at 1410 Passport Lane in Dayton, Ohio, which involved the proceeds of specified unlawful activity, that is the unlawful distribution of controlled substances and conspiracy to do the same in violation of Title 21, United States Code, Sections 841 and 846 and wire fraud in violation of 18 united States Code Section 1343, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership and control of the proceeds of said specified unlawful activities and that while conducting and attempting to conduct such financial transaction, defendants **EARL MARSHALL, TICO HILL, GLEN HURST, DEBRA HURST** and **KIM MCGINNIS** knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

-25-

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and Title 18, United States Code, Section 2.

## Count 4
### (Money Laundering)

On or about January 21, 1998, in the Southern District of Ohio, defendants **EARL MARSHALL** and **CECILE MARSHALL** did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate commerce, to wit, the purchase of the property at 4095 Little Richmond Road in Dayton, Ohio, which involved the proceeds of specified unlawful activity, that is the unlawful distribution of controlled substances and conspiracy to do the same in violation of Title 21, United States Code, Sections 841 and 846 and wire fraud in violation of 18 united States Code Section 1343, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership and control of the proceeds of said specified unlawful activities and that while conducting and attempting to conduct such financial transaction, defendants **EARL MARSHALL** and **CECILE MARSHALL** knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and Title 18, United States Code, Section 2.

-26-

**COUNT 5**
**(Continuing Criminal Enterprise)**

From in or about 1992, the exact date being unknown to the Grand Jury, and continuously thereafter up through and including October 2004, in the Southern District of Ohio and elsewhere, defendant **EARL MARSHALL** did unlawfully, knowingly, and intentionally engage in a continuing criminal enterprise in that he unlawfully, knowingly, and intentionally violated Title 21 United States Code, Sections 841(a)(1) and 846, which violations include, but are not limited to, the substantive violation alleged in Count 1; the substantive violations alleged in the Manner and Means and Overt Acts alleged in Count 1, which Manner and Means and Overt Acts are re-alleged and incorporated herein by reference as though fully set forth in this Count, which violations were part of a continuing series of violations of the Controlled Substances Act, Title 21 United States Code, Section 801, *et seq.*, undertaken by defendant **EARL MARSHALL** in concert with at least five other persons with respect to whom defendant **EARL MARSHALL** occupied the position of principal organizer, supervisor, and any position of management, and from which such continuing series of violations the defendant **EARL MARSHALL** obtained substantial income and resources.  Furthermore, defendant **EARL MARSHALL** was the principal administrator, organizer, supervisor and leader of the criminal enterprise,

-27-

which involved conspiring to possess with the intent to distribute and to distribute quantities of cocaine, a Schedule II narcotic drug controlled substance, as set forth in Count 1, and the amount of the mixture and substance was greater than 150 kilograms.

In violation of Title 21, United States Code, Sections 848(a)&(b).

## COUNT 6
### (Conspiracy to Commit Wire Fraud)

From in or about January 1997, up to and including the date of this Superseding Indictment, in the Southern District of Ohio and elsewhere, defendants **EARL MARSHALL, TRACY MARSHALL, LYNETTE DAVIS, GLEN HURST, DEBRA HURST, KIM MCGINNIS, JANELL STEPHENS** and **THERESA JONES** did knowingly, intentionally, and willfully combine, conspire, confederate, and agree with each other, and with others whose identities are both known and unknown to the Grand Jury, to commit an offense against the United States as follows:

Defendants **EARL MARSHALL, GLEN HURST, TRACY MARSHALL, LYNETTE DAVIS, DEBRA HURST, KIM MCGINNIS, JANELL STEPHENS**, and **THERESA JONES**, along with their co-conspirators, whose identities are known to the Grand Jury, devised a scheme and artifice to defraud and to obtain money and property by false and fraudulent

-28-

pretenses, representations, and promises from various financial institutions and other lenders by, among other things, knowingly submitting false documents to those financial institutions in support of loan applications, including false Uniform Residential Loan Applications, false payroll records and false tax forms.

In doing so, defendants **EARL MARSHALL, GLEN HURST, TRACY MARSHALL, LYNETTE DAVIS, DEBRA HURST, KIM MCGINNIS, JANELL STEPHENS** and **THERESA JONES,** and for the purpose of executing said scheme and artifice, and in attempting to do so, did knowingly transmit and cause to be transmitted in interstate commerce, by means of wire communication, certain signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343.

### BACKGROUND AND OBJECTS OF THE CONSPIRACY

At all times relevant to this conspiracy:

1.  Defendant, **GLEN HURST,** was the owner and manager of American Funding Group, Inc., later known as American Funding Agency, Inc., and defendants **DEBRA HURST** and **KIM MCGINNIS** were employees of American Funding Group, Inc., which was located at 8126 North Main Street, Dayton, Ohio 45415.

2.  Defendants **EARL MARSHALL, TRACY MARSHALL, LYNETTE DAVIS, JANELL STEPHENS,** and **THERESA JONES,** either personally or through associates, were clients of and fraudulently obtained mortgage loans through American Funding Group, Inc.

3.  The lending institutions which funded the fraudulently

-29-

obtained loans included, among others, Accredited Home Lenders, Aegis Mortgage Company and Option One Mortgage Corporation.

4.  The object of the conspiracy was to obtain mortgage loans from various lenders based on fraudulent information.  The loans would sometimes be in the names of straw purchasers with defendant **EARL MARSHALL** providing any money necessary to complete the loan and purchase process.

### Manner and Means

In order to accomplish the foregoing objects of the conspiracy, the defendant used the following manner and means, among others:

1.  It was part of the conspiracy and scheme to defraud that defendants **GLEN HURST, DEBRA HURST** and **KIM MCGINNIS**  submitted or directed and caused the submission of various false financial figures, false attachments including Uniform Residential Loan Applications (Form 1003), Housing and Urban Development Forms (HUD-1 Settlement Statement), and other documents and the like to the lenders.  Specifically, defendants **GLEN HURST, DEBRA HURST,** and **KIM MCGINNIS** deliberately misrepresented to lenders the financial status of the true or purported purchasers and the true value of the real properties that were being transferred.

2.  It was further part of the conspiracy and scheme to defraud that defendants **EARL MARSHALL, TRACY MARSHALL, LYNETTE DAVIS, JANELL STEPHENS,** and **THERESA JONES** would provide

-30-

information such as business names, addresses, Employer Identification numbers, personal tax information and other false information to defendants **GLEN HURST, DEBRA HURST,** and **KIM MCGINNIS** for use in falsely completing the above described forms and would participate in the scheme or artifice as straw or nominee purchasers.

3. It was further part of the conspiracy and scheme to defraud that prior to closing, in many instances, defendant **GLEN HURST** would purchase a cashier's check from his personal account and take it to closing for the buyer. In some cases, the funds for the cashier's check would be provided by defendant **EARL MARSHALL.**

4. It was further part of the conspiracy and scheme to defraud that for each real estate transaction noted as an overt act, interstate wire communications/transactions would be conducted by means of electronic transfer of funds and interstate facsimile communications all in furtherance of the charged conspiracy.

**OVERT ACTS**

In furtherance of the conspiracy and to effectuate the objects of the conspiracy, the following overt acts, among others, were committed in the Southern District of Ohio and elsewhere:

1. In or about December 1998, defendant **EARL MARSHALL** sought

-31-

and received a mortgage/refinance loan of approximately $44,000 for the property at 2516 Germantown, Dayton, Ohio.  The loan was obtained with the assistance of defendants **GLEN HURST, DEBRA HURST,** and **KIM MCGINNIS** through American Funding Group, Inc., from Accredited Home Lenders, Inc., located in California.  The processing of the application included the interstate wire transmission of fraudulent documents on or about December 8, 1998 and the electronic transfer of funds in the amount of approximately $43,588.31 on December 31, 1998.

2.  On or about January 28, 1999, defendant **THERESA JONES** purchased the property at 5104 Gardendale, Dayton, Ohio using, in part, a $33,000 loan fraudulently obtained with the assistance of defendants **GLEN HURST, DEBRA HURST,** and **KIM MCGINNIS** through American Funding Group, Inc., from Option One Mortgage Corporation.

3.  On or about March 26, 1999, defendant **LYNETTE DAVIS** purchased the property at 3721 West Second Street, Dayton, Ohio using, in part, a $45,600 loan fraudulently obtained through American Funding Group, Inc., from Option One Mortgage Corporation.

4.  On or about March 31, 1999, defendant **JANELL STEPHENS** purchased the property at 4424 Genesee Street, Dayton, Ohio using, in part, a $41,300 loan fraudulently obtained through American Funding Group, Inc., from Option One Mortgage

Corporation.

5.  On or about September 7, 1999, defendant **EARL MARSHALL** purchased the property at 2955 Ensley, Dayton, Ohio using, in part, a $147,000 loan fraudulently obtained through American Funding Group, Inc., from Option One Mortgage Corporation.

6.  On or about May 30, 2001, defendant **TRACY MARSHALL** purchased the property at 1307 Blairwood, Dayton, Ohio using, in part, a $120,001 loan fraudulently obtained through American Funding Group, Inc., from Equicredit.

7.  On or about July 19, 2001, defendant **LYNETTE DAVIS** purchased the property at 106 Deans Court, Dayton, Ohio using, in part, a $165,750 loan fraudulently obtained through American Funding Group, Inc., from Mortgage Lenders Network in Middletown, Connecticut.  The loan processing included the interstate transmission of documents relevant to the loan on approximately July 19 and 23, 2001.

8.  On or about September 21, 2001, defendant **TRACY MARSHALL** purchased the property at 6600 Westford Ave., Dayton, Ohio as alleged in Overt Act 7 of Count 2 of this Superseding Indictment. The processing of that loan included the interstate transmission of documents relevant to the loan on or about September 7 and 21, 2001.

9.  On or about October 2, 2001, a female associate of defendant **EARL MARSHALL** purchased the property at 1812 DeWitt,

-33-

Dayton, Ohio using, in part, a $55,200 loan fraudulently obtained through American Funding Group, Inc., from Aegis Mortgage Corporation.

All in violation of 18 U.S.C. § 371.

## Count 7
### (False Declarations Before a Grand Jury)

On or about September 29, 2004, in the Southern District of Ohio, defendant **THERESA JONES**, while under oath and testifying in a proceeding before Grand Jury 03-1 in Dayton, Ohio, a Grand Jury of the United States in the Southern District of Ohio, knowingly did make false material declarations, that is to say:  At the time and place aforesaid the Grand Jury was conducting an investigation to determine whether violations of Title 18 United States Code, Section 1956 had been committed, and to identify the person or persons who had committed, caused the commission of, and conspired to commit such violations.  It was material to the said investigation that the Grand Jury ascertain if defendant **EARL MARSHALL** (who is not charged in this count), or one of his associates, had ever provided U.S. currency to other individuals with instructions to electronically transfer that currency to another party on behalf of defendant **EARL MARSHALL.**  At the time and place alleged, defendant **THERESA JONES** appearing as a witness under oath at a proceeding before the Grand Jury knowingly made

-34-

the following declarations (noted as answers) in response to questions with respect to the material matter alleged above as follows:

Q. Did someone ask you to write the check to John Turner for a bus?

A. <u>No</u>.

Q. You just did it all on your own?

A. <u>I volunteer</u>.  I said if they don't have any money. So I was, I was going to sell CD's.  We were going to sell CD's, you know, like on the streets or whatever and <u>I said, well, I have this money saved up and I said, I will volunteer and I would, you know, write it out to them and loan them the money</u>.

. . .

Q. So in any event back in or about April of last year you volunteered to send $5,250 on behalf of the Little Tykes or Iced Out Records?

A. <u>Right</u>.

. . .

Q. And why did you do that?

A. Why did I do that?

Q. Yeah.

A. Because like I said this is like my family and where I had nowhere to stay, the family took me in and I

-35-

stayed with them; and I know that I can get my money back, you know, when it is paid off. I don't have any kids or anything. I'm on my own and work and stuff. <u>It wasn't a problem for me to lend it</u>.

. . .

Q. My question is what is it that you asked your sister to do?

A. To wire that money.

Q. And why did you ask your sister to wire the money?

A. <u>Because they had it</u>.

Q. Because who had it?

A. <u>My sister</u>.

The aforesaid underscored testimony of defendant **THERESA JONES**, as she then and there well knew and believed, was false in that, defendant **THERESA JONES** prior to and at the time of said testimony knew she had received U.S. currency from or on behalf of defendant **EARL MARSHALL**, and used some of that money, and not her own funds, to cover the check she issued to a John Turner, that she wired some of that money, and not her own funds, to a transportation company for a bus, that she gave some of that money to her sister to wire to the transportation company for a bus, and that her sister did not use her own funds to complete the transaction.

All in violation of Title 18, United States Code, Section 1623.

-36-

**SENTENCING ENHANCEMENTS**

The Grand Jury further alleges:

1. During the conspiracy charged in Count 1, defendants **EARL MARSHALL, TICO HILL,** and **JEFF PARKER** were responsible for the distribution, possession with intent to distribute and conspiracy to do same, of in excess of 150 kilograms of cocaine.

2. During the conspiracy charged in Count 1, defendants **EARL MARSHALL, TICO HILL,** and **JEFF PARKER** each possessed a firearm.

3. For the crimes described in Counts 1 and 2, defendant **EARL MARSHALL** was an organizer or leader of criminal activities (for each count) that involved five or more participants or that was otherwise extensive.

4. For the crimes described in Counts 1 and 2, defendants **TICO HILL** and **JEFF PARKER** were managers or supervisors (but not organizers or leaders) and the criminal activity (for each count) involved five or more participants or was otherwise extensive.

5. Defendants **EARL MARSHALL, TICO HILL,** and **JEFF PARKER** were responsible for the underlying drug trafficking offenses from which the money laundered funds in Counts 2-4 were derived.

6. During the conspiracy charged in Count 2, defendants **EARL MARSHALL, GLEN HURST, DEBRA HURST** and **KIM MCGINNIS** were responsible for laundering more than $120,000.00 in proceeds of some form of unlawful activity.

7. During the conspiracy charged in Count 6, defendants **EARL**

-37-

**MARSHALL, GLEN HURST, DEBRA HURST**, and **KIM MCGINNIS** were responsible for obtaining more than $1,000,000.00 in loans by means of the charged fraudulent activities.

8.  For the offenses charged in Count 2,  defendants **EARL MARSHALL, TICO HILL, JEFF PARKER, TRACY MARSHALL, CLARENCE PARKER, CECILE MARSHALL, LYNETTE DAVIS, GLEN HURST, DEBRA HURST, KIM MCGINNIS, CHARLES GOFF, JR., BRYANT BRIGGS, JANELL STEPHENS,** and **THERESA JONES** knew or believed that at least some of the laundered funds were the proceeds of, or were intended to promote offenses involving the distribution of a controlled substance.

A TRUE BILL

FOREPERSON

GREGORY G. LOCKHART
United States Attorney

J. RICHARD CHEMA
CHIEF, CRIMINAL DIVISION

-38-